IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

JOHN PHILLIP BERRYHILL                                                               PLAINTIFF

V.                                                                       NO. 1:12-CV-00157-DMB-DAS

APAC-MISSISSIPPI, INC.                                                              DEFENDANT

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION FOR SUMMARY JUDGMENT**

This is an employment discrimination action brought by Plaintiff John Phillip Berryhill against his former employer, Defendant APAC-Mississippi, Inc. Plaintiff alleges that, following years of seasonal employment as a paver operator, Defendant violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*., when it refused to re-hire him at the start of the 2011 employment season. Doc. #1. On September 3, 2013, Defendant filed a motion for summary judgment seeking dismissal of Plaintiff's sole claim. Docs. #36, 37.

**I.**
**Motion for Summary Judgment Standard**

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transport A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Id*. at 411–12 (internal quotation marks omitted). To this end,

"[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id*. at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## II.
### Relevant Facts

Plaintiff was born on April 22, 1961. Doc. #40-1 at 54. He has an eleventh grade education. *Id.* at 12. Defendant, a subsidiary of the national corporate entity APAC, oversees APAC's operations across six geographic regions throughout the State of Mississippi. Doc. #40-2 at 4–5. The Northeast Region, the subject of this litigation, contains two sub-regions: Tupelo/Guntown and Corinth. *Id.* at 5–6.

Since 2000, Defendant has operated three road crews in the Northeast Region – one in Tupelo (also called "Auburn Road"), one in Guntown, and one in Corinth. *Id.* at 13–14; Doc.

#40-4 at 5. Road crews typically are composed of between twelve and fifteen employees, including a foreman, a superintendent and an estimator. Doc. #40-2 at 19. During the period relevant to this litigation, Juan Rios served as estimator for all three facilities; Keith Kelly served as superintendent for the Tupelo and Guntown facilities; and Gale "J.R." Yates, Jr., worked as the foreman for the Guntown crew. Doc. # 40-4 at 5–6; Doc. #40-5 at 7–8; Doc. #40-3 at 5–6.

Pursuant to Defendant's company policy, road crews are laid off at the beginning of the winter months (typically mid-December or early-January) and re-hired at the beginning of spring (typically March or April). Doc. #40-2 at 10–11. The company decides whether to re-hire a road crew worker by looking at the person's ability to do his job and whether the person is "a team player and [can] get[] along with other people." *Id*. at 21.

On March 9, 1998, Plaintiff was hired by Defendant to work as a "labor guy" on the Guntown crew. Doc. #40-1 at 58. In 2001, he was promoted to the role of "paver operator." *Id*. In addition to his paving responsibilities, Plaintiff was responsible for performing a wide range of duties including "laborer, asphalt raker, asphalt distributor, loader operator, back hoe operator, [and] flag person." Doc. #40-6; Doc. #40-5 at 21–22. Yates testified that he never observed Plaintiff refuse to perform an assigned duty and that, due to his versatility, Plaintiff was a "very valuable" member of the crew. Doc. #40-5 at 22–24. Furthermore, according to Yates, Plaintiff "was a good paver operator" and the best on the Guntown crew. *Id*. at 10. Members of the Guntown crew referred to Plaintiff as "the real deal." Doc. #40-1 at 119. It is undisputed that, as of December 2010, Plaintiff was the best non-supervisory paver operator on the Guntown crew. Doc. #40-4 at 30.

However, Superintendent Kelly and Andrew Atkins, the supervisor of the Northeast Region, both testified to occasions when Plaintiff refused to perform an assigned duty. Doc.

3

#40-2 at 26; Doc. #40-4 at 14–15. Moreover, during his tenure as an employee of Defendant, Plaintiff received six write-ups for violations of company policies: (1) an April 21, 1998, "first warning" for an "[a]ttendance" violation; (2) an October 6, 2000, written warning for hitting a street light while operating a back hoe; (3) an April 21, 2006, suspension for allowing another employee to ride on the hood of a paver while the vehicle was in motion; (4) a March 10, 2008, written warning for "making racial, ethnic slurs and intimidation of other employees;"[1] (5) a May 29, 2008, warning based on complaints of racial harassment by fellow employees due to racially derogatory and threatening remarks made by Plaintiff;[2] and (6) a July 9, 2008, warning for showing up late to work without giving notice.[3] Doc. #36-7.

On December 4, 2010, commensurate with Defendant's seasonal layoff policy, Defendant laid off all the non-salaried members of the Northeast Region's three road crews, including Plaintiff. Doc. #40-1 at 63–65.

Following the seasonal layoffs, Defendant convened a management meeting in December 2010 to discuss permanent layoffs in the Tupelo/Guntown sub-region. Doc. #40-5 at 10–12. The meeting was attended by Don Farr (a foreman), Juan Rios (the estimator for the Northeast Region), Andy Atkins (supervisor of the Northeast Region), Keith Kelly (superintendent of

---

[1] The circumstances prompting this warning are documented to be when "the crews were together talking about politics and Obama and the [sic] Berryhill had made some racial remarks." Doc. #36-7.

[2] The May 29, 2008, write-up detailed a series of racially-charged actions Plaintiff took against his then-co-workers. Doc. #36-7 at Ex. 8. Specifically, the write-up stated that: (1) Don Farr complained that Plaintiff "started making comments about [then-Candidate] Obama and said that if he gets the presiden[c]y, he and his KKK Clan members were going to do something;" (2) Earskin Childs complained that, upon learning that another co-worker's ex-wife had an African American child, described by Plaintiff as "a white lady having black babies," Plaintiff said, "I don't appreciate that," and that the child was "the 'strip[]ed' kid – a kid by a black man;" and (3) Farr stated that Plaintiff placed a "rebel flag" on his paver. *Id*. Plaintiff denied the allegations, but was told that he would be terminated if another employee complained. *Id*. In the same write-up, Plaintiff is reported to have told a co-worker who goes to church early on Wednesday nights that the co-worker "was going to have to 'change denominations' so that he could work." *Id*.

[3] The incident was written up on an "Employee Warning Notice" form, but the "warning" box under the "Actions to be Taken" heading is not checked. *See* Doc. #36-7.

4

Tupelo and Guntown), J.R. Yates (a foreman), and Michael Rodgers (a foreman). *Id.* at 13. At the meeting, Rios, Atkins and Farr expressed a desire to permanently layoff three members of the Guntown crew: Plaintiff, Earskin Childs (59 years old), and Johnny Kimble (then in his mid-50s). *Id*. at 13; Doc. #40-4 at 21; Doc. #40-1 at 65. The stated justification for the proposal to terminate Plaintiff was his "rough" treatment of equipment. Doc. #40-5 at 16. Yates objected to all three proposed terminations and felt that the proposed termination of Plaintiff was "something personal" and unrelated to job performance. *Id.* at 14–15, 17.

A second meeting of the same individuals was held on January 3, 2011. Doc. #40-5 at 15. At the meeting, road crew terminations once again were discussed. *Id*. at 18. Additionally, Yates (who was then approximately 62 years old) and Rodgers (then approximately 42 years old) were informed that one of them would have to retire as foreman. *Id.* at 18–19. Yates offered to retire because he had the capacity to draw social security, while Rodgers did not. *Id*. at 19–20. Following Yates's decision, Yates was told he could go home.[4] *Id.* at 18.

At 2:15 p.m. on January 3, 2011, Kelly informed Plaintiff that he would not be re-hired due to cutbacks in the size and number of crews. Doc. #40-1 at 63. Plaintiff was then 49 years old. Atkins testified that the decision to permanently layoff Plaintiff was reached by himself, Rios and Kelly, and was based on a decision to reduce "the [Guntown] crew down to a smaller parking lot type crew [that] could work together." Doc. #40-2 at 8–9, 22. Atkins further testified that, in making this decision, he considered Plaintiff's alleged refusal to perform assigned duties and "some incidences where he was [written] up for some racial disagreements he might have had with some of the other crew members." *Id*. at 27.

---

[4] Later, Yates was brought back as an hourly employee. Doc. #40-4 at 36–37.

In addition to Plaintiff, Childs and Kimble also were terminated.[5] Doc. #40-4 at 21; Doc. #36-6 at 16. The termination notices for all three men list "reduction in work force – reduction" as the "Termination Reason." Doc. #36-3. Seven members of the 2010 Guntown crew were re-hired: James Depriest (approximately 51 years old), Yates (approximately 62 years old), Dean Farr (approximately 56 years old), James Tollison (approximately 54 years old), Mickey Bishop (approximately 53 years old), Thomas White (approximately 54 years old), and Jarrett Farr (approximately 23 years old). Doc. #40-4 at 22–23. The shrunken Guntown unit was referred to as a "parking lot" crew. Doc. #40-2 at 14.

In March 2011, Defendant hired three "flaggers" for the Guntown and Tupelo crews: Ernest Jones, who was in his late twenties or early 30s; Robert Morris, who was in his mid-40s; and Dewayne Turner, who was in his mid-30s. Doc. #40-4 at 23–26. The three men were hired because Defendant "picked up a few jobs." *Id.* at 19. Jones and Turner were assigned to the Guntown crew; Morris was assigned to Tupelo. *Id.* at 24. Kelly testified that insofar as Turner, Morris, and Jones were hired as "laborers," they were cheaper than Plaintiff, Childs, and Kimble. *Id.* at 38.

When Defendant's construction season opened in May 2011, Dean Farr and Yates primarily operated the paver while Jarrett Farr received training on the equipment. Doc. #40-4 at 18. Toward the end of 2011, Jarrett Farr took over primary operation of the paver. *Id.* In September 2011, Defendant "dethrottled" the Northeast Region and reduced the Tupelo and Guntown crews, first to a partial crew and a main line paving crew, and eventually to just one crew. *Id.* at 19. To this day, Defendant maintains one full road crew in its Tupelo/Guntown sub-region. *Id.*

---

[5] Four employees from Corinth also were permanently terminated. Doc. #40-4 at 12. However, the Corinth decisions were made by a different group of managers. *Id.*

On July 12, 2012, after exhausting his administrative remedies, Plaintiff filed the instant action alleging age discrimination in violation of the Age Discrimination in Employment Act. Doc. #1.

## III.
## Analysis

The Age Discrimination in Employment Act ("ADEA") "prohibit[s] employers from discharging or otherwise discriminating against any individual because of his or her age." *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013). The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to claims brought under the ADEA. *Id*.

> Under this framework, the employee carries the initial burden of establishing a prima facie case of age discrimination. If he succeeds, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for terminating employment. If the employer satisfies this burden, the burden shifts back to the employee to prove either that the employer's proffered reason was not true—but was instead a pretext for age discrimination—or that, even if the employer's reason is true, he was terminated because of his age.

*Id*. (internal citations omitted).

**A. Plaintiff's Prima Facie Case**

In evaluating whether Plaintiff has established a prima facie case under the ADEA, it is important to classify what kind of claim Plaintiff has advanced. More specifically, the Court must decide whether Plaintiff alleges a wrongful discharge claim or a claim for discriminatory failure to hire. *Compare Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (setting forth wrongful discharge prima facie standard) *with Evans v. City of Bishop*, 238 F.3d 586, 590 (5th Cir. 2000) (setting forth failure to hire prima facie standard). In this regard, courts have held that a failure to re-hire should be analyzed under a discriminatory discharge standard. *See Conner v. Colony Lake Lure*, No. 4:97-cv-01, 1997 WL 816511 at *7 (W.D. N.C.

7

Sep. 4, 1997) ("The Fourth Circuit has not adopted a test for assessing a plaintiff's claim against a private employer for discriminatory failure to [re-]hire … but the standard laid out … for discriminatory discharge claims provides the proper framework."); *see also Bogues v. Town of Trumbull*, 383 F.Supp.2d 348, 356 (D. Conn. 2005) ("failure to automatically renew the plaintiff's contract…could be considered effectively a termination."). The Court finds this conclusion instructive and will employ a wrongful discharge analysis in analyzing Plaintiff's claim.

Under Fifth Circuit law, to establish a prima facie case of age discrimination, "a plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Jackson*, 602 F.3d at 378. To make a prima facie case, "a plaintiff need only make a very minimal showing." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).

As an initial matter, for the reasons above, the Court concludes that Plaintiff was discharged within the meaning of the ADEA when Defendant refused to re-hire him at the beginning of the 2011 season. *See Bogues*, 383 F.Supp.2d at 356.

With regard to Plaintiff's qualification to hold his position, the Fifth Circuit has explained that "a plaintiff challenging his termination … can ordinarily establish a prima facie case of age discrimination by showing that he continued to possess the necessary qualification for his job at the time of the adverse action." *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1506 (5th Cir. 1988). Under this standard, a plaintiff need not "prove he is meeting his employer's reasonable expectations." *Id.* at 1505. Rather, the question is whether "plaintiff … suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him

unfit for the position for which he was hired." *Id.* at 1506 n.3. Here, multiple employees of Defendant testified to Plaintiff's more than adequate ability to operate the paver. Yates, a current employee of Defendant, testified to Plaintiff's capacity to perform a wide number of tasks for the road crew. Under these circumstances, the Court concludes that Plaintiff met his "very minimal" burden of showing his qualifications for his position.

"Under the ADEA, the protected class is limited to persons at least 40 years of age or older." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 n.22 (5th Cir. 2005) (citing 29 U.S.C. § 631(a)). In the present matter, there is no dispute that Plaintiff, who was 49 years old at the time of his termination, was a member of the protected class during the time period relevant to this suit.

Finally, it is undisputed that in the time period following Plaintiff's termination, Jarrett Farr, a male in his early twenties, was trained on the paver and subsequently replaced Plaintiff as the Guntown crew's paver operator.[6] Thus, Plaintiff has satisfied the fourth and final prong of his prima facie case.

B. **The Defendant's Burden**

Having found that Plaintiff established a prima facie case of age discrimination, the burden shifts to Defendant to show a legitimate, nondiscriminatory reason for Plaintiff's termination. *Miller*, 716 F.3d at 144. Plaintiff does not contest that Defendant has offered a legitimate, nondiscriminatory reason for Plaintiff's termination: the company wanted to shrink

---

[6] Because the Court concludes that Plaintiff was actually replaced by a younger individual, it is unnecessary to evaluate the claim under a reduction in work force standard. *See Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 812 (5th Cir. 1991) ("The most significant distinction is that reduction-case plaintiffs are simply laid off and thus are incapable of proving actual replacement by a younger employee.") (internal punctuation omitted). To the extent the reduction in work standard is appropriate, Plaintiff has made out a prima facie case by showing that he was terminated, and that younger employees were hired to fill a position for which he was qualified (flagger). *See id.* at 812–13 (reduction in force prima facie case met where plaintiff "was in the protected age group, was adversely affected by the company's decision, and was qualified for three positions that were filled by [two younger] persons retained by the company.").

the size of the Tupelo/Guntown crews and based retention of employees on a person's ability to work as a team.

### C. Pretext

"If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010). "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (internal quotation marks omitted). More specifically, where a defendant asserts a reduction in force as its legitimate nondiscriminatory reason, a plaintiff

> can raise a genuine dispute as to pretext by proffering competent summary judgment evidence that (1) he was "clearly better qualified" than similarly-situated younger employees who were not terminated, (2) the reduction in force was a sham or a pretext for age discrimination, or (3) although the reduction in force was legitimate on its face, [it was] implemented … in such a way that age was impermissibly used as a factor to determine which employees were terminated.

*Peterson v. Bell Helicopter Textron, Inc.*, 901 F.Supp.2d 846, 858 (N.D. Tex. 2012) (citing *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996)).

As evidence of pretext, Plaintiff points to the following facts: (1) Plaintiff was the best paver operator on his crew; (2) "[c]ontrary to Defendant's claims, [Plaintiff] never refused to do any of the jobs he was asked to do;" (3) contrary to what Kelly told Plaintiff on January 3, 2011, Defendant did not reduce its number of crews at the beginning of the season; (4) Defendant permanently laid off three Guntown crew members and replaced them with three new employees; and (5) Plaintiff's past disciplinary problems were more than two years old at the time of the termination. Doc. #39 at 11–12.

With regard to proving pretext through qualification, the Fifth Circuit has held that "the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001).

Here, while it is arguable that Plaintiff was a more qualified paver operator than all of the retained employees, Defendant offered uncontroverted evidence that work ability was not the only (or indeed most important) qualification for continued employment on the Guntown crew. Rather, Defendant deemed the ability to work in a team to be the primary consideration in retaining crew members. In this regard, Defendant considered Plaintiff's history of racial harassment, and allegations that Plaintiff had declined to perform certain duties.

Although Plaintiff objects to the consideration of the racial harassment, the Court notes that, absent evidence that Defendant failed to consider older disciplinary actions of other employees, the two-year gap between Plaintiff's racial harassment write-up and his termination does not provide evidence of pretext. *See Drew v. Quest Diagnostics, Inc.*, No. 1:10-cv-00907, 2012 WL 2341690, at *5 (S.D. Ohio June 20, 2012) (genuine issue of pretext raised as to reduction in force lay-off where discipline was considered and "another employee's discipline in the relevant time-period was not considered in the calculation"). Furthermore, while Yates testified that he never observed Plaintiff refuse to perform an assigned job, the evidence is undisputed that Plaintiff refused certain duties assigned by Atkins and Kelly.[7] Considering

---

[7] In his summary judgment response, Plaintiff asserts that he did "whatever they needed him to do." Doc. #39 at 3. As support for this statement, Plaintiff points to his deposition testimony that "I did a little of everything when I was there." *Id.* (*citing* Doc. #40-1 at 75). Plaintiff also testified that "[i]f they told me to get on a backhoe, I got on a

Plaintiff's skill on the paver against his history of racial harassment of co-workers and his refusal to perform certain duties, the Court concludes that there is no genuine issue of material fact as to whether no reasonable person, in the exercise of impartial judgment, could have chosen the retained employees over Plaintiff. *See Celestine*, 266 F.3d at 357.

Turning to the legitimacy of the reduction in force itself, Plaintiff focuses primarily on Defendant's hiring of three employees following the termination of three ADEA-protected employees. In this regard, the record reflects that Defendant terminated three ADEA protected workers (including Plaintiff) from the Tupelo/Guntown sub-region and then hired three younger "flaggers," following the "pick-up" of jobs. Defendant subsequently downsized the Tupelo/Guntown crews.

The facts of this case are startlingly similar to those in *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996), *abrogation on other grounds recognized by Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225–26 (5th Cir. 2000). In *Brown*, a reduction-in-force plaintiff attempted to establish pretext by arguing that the employer's workforce increased in the months following the announcement of the layoffs and that "many" of the new hires were younger than the plaintiff. *Id.* at 657. The *Brown* court found no genuine issue of material fact as to pretext because the new hires were inspired by an up-tick in business and, "[a]fter the windfall passed, [defendant] made significant cutbacks." *Id*. The court also noted that all the new hires were in "low-level" positions. *Id*.

---

backhoe." Doc. #40-1 at 75. These statements are not denials of either Kelly's or Atkins's allegations. Plaintiff does not cite to an explicit denial of the allegations, and the Court has been unable to find one in the record. Even if Plaintiff denied the allegations, "[g]enerally denying the alleged wrongdoing upon which the termination was based is not sufficient to rebut a defendant's reasons for terminating a plaintiff." *Stallworth v. Singing River Health Sys.*, No. 1:10-cv-123, 2011 WL 2532473, at *3 (S.D. Miss. June 24, 2011) (citing *Warren v. Texas Disposal Sys., Inc.*, 414 Fed. App'x 645 (5th Cir. 2011)); *see also Harris v. Mississippi Transp. Comm'n*, No. 3:07-cv-366, 2008 WL 5427797, at *8 (S.D. Miss. Dec. 30, 2008) ("The Court finds that Harris's denials of the misconduct underlying the decision of the MTC to terminate his employment do not create a genuine issue of material fact on the issue of pretext.").

Here, as in *Brown*, Defendant hired new employees following an up-tick in business, but completed the planned reduction in force following the end of the increase in business. Furthermore, as in *Brown*, the new hires were in lower level positions than Plaintiff. Under these circumstances, the Court concludes that Plaintiff has failed to create a genuine issue of material fact that the reduction in force was a sham. *See Brown*, 82 F.3d at 657; *see also*, *Wasson v. City of Dallas*, No. 3:96-cv-2844, 1998 WL 7154, at *3 (N.D. Tex. Jan. 7, 1998) ("Wasson alleges that the relocation services section's hiring of two new employees near the time of the RIF evidences pretext. However, because the new employees were apparently placed in non-supervisory positions, the hirings merely evidence that there was an increased demand for the type of work performed by lower level employees, not that Wasson was forced to retire because of his age.") (internal footnote omitted).

Finally, Plaintiff has not argued that the reduction in force was implemented in such a way where age was impermissibly used as a factor to determine which employees were terminated. In sum, Plaintiff has failed to create a genuine issue of pretext. Accordingly, Defendant's Motion for Summary Judgment must be **GRANTED**.

SO ORDERED, this the 23rd day of July, 2014.

    **/s/ Debra M. Brown**
    **UNITED STATES DISTRICT JUDGE**